AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

INFORMATION ASSOCIATED WITH TWO INSTAGRAM ACCOUNTS THAT ARE STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC. PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATIONS OF VIOLATIONS OF 21 U.S.C. § 841, 18 U.S.C. §§ 922(g)(1), 922(o), and 924(c)

)
)
)
)
)
)
)

Case No. 23-SC-656

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

Located in the _____ Jurisdiction of the District of Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|

violations of Possession with the Intent to Distribute a Controlled Substance, in violation of 21 U.S.C. § 841(a)(1); Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1); Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c); and Possession of a Machine Gun (Conversion Device), in violation of 18 U.S.C. § 922(o) .

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

- ❑ Continued on the attached sheet.
- ❑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Rebekah Moss*

*Applicant's signature*

Rebekah Moss, Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

Telephone _____ *(specify reliable electronic means).*

Date: _____ 3/15/2023 _____

*Judge's signature*

City and state: _____ Washington, D.C. _____

Zia M. Faruqui

United States Magistrate Judge

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.  23-SC-656 |
| INFORMATION ASSOCIATED WITH TWO INSTAGRAM ACCOUNTS | ) | |
| THAT ARE STORED AT PREMISES CONTROLLED BY META | ) | |
| PLATFORMS, INC. PURSUANT TO 18 U.S.C. § 2703 FOR | ) | |
| INVESTIGATIONS OF VIOLATIONS OF 21 U.S.C. § 841, 18 U.S.C. §§ | ) | |
| 922(g)(1), 922(o), and 924(c) | | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure  of the following person or property located in the <u>Jurisdiction of the District of Columbia.</u>
*(identify the person or describe the property to be searched and give its location)*:

See Attachment  A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____March 28, 2023_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Zia M. Faruqui_____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   _____3/15/2023_____          _____
                                                                                                        *Judge's signature*

City and state:      _____Washington, D.C._____          _____Zia M. Faruqui_____
                                                                                            United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>23-SC-656 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to information associated with the following Instagram accounts ("TARGET ACCOUNTS") that are stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("PROVIDER"), a company headquartered at 1601 Willow Road, Menlo Park, California 94025:

1. Username - "no3ree" ("TARGET ACCOUNT-1"), with an Instagram user ID 1214590410.
2. Username - "nw3ree" ("TARGET ACCOUNT-2"), with an Instagram user ID 54544360046.

## ATTACHMENT B

### Particular Things to be Seized

**I.     Information to be disclosed by Meta Platforms, Inc. ("PROVIDER")**

To the extent that the information described in Attachment A is within the possession, custody, or control of PROVIDER, including any records that have been deleted but are still available to PROVIDER, or have been preserved pursuant to a request or requests made under 18 U.S.C. § 2703(f), PROVIDER is required to disclose the following information to the government corresponding to the TARGET ACCOUNTS listed in Attachment A:

A.     All business records and subscriber information, in any form kept, pertaining to the account, including:

1.     Identity and contact information (past and current), including full name, e-mail addresses, physical address, date of birth, phone numbers, gender, hometown, occupation, websites, and other personal identifiers;

2.     All Instagram usernames (past and current) and the date and time each username was active, all associated Instagram and Facebook accounts (including those linked by machine cookie), and all records or other information about connections with Facebook, third-party websites, and mobile apps (whether active, expired, or removed);

3.     Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

4.     Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers;

5.     All advertising information, including advertising IDs, ad activity, and ad topic preferences;

6.     Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers, August 1, 2022 to the PRESENT**;**

7.     Privacy and account settings, including change history; and

8.     Communications between Meta and any person regarding the account, including contacts with support services and records of actions taken;

B.    All content (whether created, uploaded, or shared by or with the account), records, and other information relating to videos (including live videos and videos on IGTV), images, stories and archived stories, past and current bios and profiles, posts and archived posts, captions, tags, nametags, comments, mentions, likes, follows, followed hashtags, shares, invitations, and all associated logs and metadata, August 1, 2022 to the PRESENT;

C.    All content, records, and other information relating to communications sent from or received by the account August 1, 2022 to the PRESENT, including but not limited to:

    1.    The content of all communications sent from or received by the account, including direct and group messages, and all associated multimedia and metadata, including deleted and draft content if available;

    2.    All records and other information about direct, group, and disappearing messages sent from or received by the account, including dates and times, methods, sources and destinations (including usernames and account numbers), and status (such as delivered, opened, replayed, screenshot);

    3.    All records and other information about group conversations and video chats, including dates and times, durations, invitations, and participants (including usernames, account numbers, and date and time of entry and exit); and

    4.    All associated logs and metadata;

D.    All content, records, and other information relating to all other interactions between the account and other Instagram users August 1, 2022 to the PRESENT, including but not limited to:

    1.    Interactions by other Instagram users with the account or its content, including posts, comments, likes, tags, follows (including unfollows, approved and denied follow requests, and blocks and unblocks), shares, invitations, and mentions;

    2.    All users the account has followed (including the close friends list), unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow, and of users who have followed, unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow the account;

    3.    All contacts and related sync information; and

    4.    All associated logs and metadata;

E.    All records of searches performed by the account August 1, 2022 to the PRESENT; and

F.    All location information, including location history, login activity, information geotags, and related metadata August 1, 2022 to the PRESENT.

Within fourteen (14) days of the issuance of this warrant, PROVIDER shall deliver the

information set forth above to the following:

> Special Agent Rebekah Moss
> ATF – Washington Field Division
> Email: Rebekah.Moss@atf.gov
> 202-763-3076

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of Possession with the Intent to Distribute a Controlled Substance, in violation of 21 U.S.C. § 841(a)(1); Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1); Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c); and Possession of a Machine Gun (Conversion Device), in violation of 18 U.S.C. § 922(o) (the "SUBJECT OFFENSES"), by Noah JACKSON ("JACKSON"), as described in the affidavit in support of this warrant, associated with the TARGET ACCOUNTS, including, but not limited to:

a.   Evidence concerning the sourcing, distribution, intended distribution, and/or unlawful possession of controlled substances including but not limited to cocaine, marijuana, oxycodone, and promethazine with codeine, or any conspiracy thereof;

b.   Records and information containing indicia of distribution of, or possession with intent to distribute, controlled substances, including packaging materials, drug paraphernalia, illicit proceeds or money laundering of such proceeds, and items used in the preparation, sale, transfer, weighing, transportation and packaging of illegal narcotics substances;

c.   Information that constitutes evidence concerning the unlawful possession of firearms, ammunition, and firearm accessories, including firearms with a conversion device, capable of converting semi-automatic firearms into fully automatic machineguns;

d.   Evidence of the sourcing and distribution of any firearms, ammunition, and firearm accessories, including conversion devices or ammunition, and evidence concerning items associated with ownership of firearms such as magazines, bulletproof vests, gun-cleaning kits, gun-sights, holsters, and records, documents, electronic evidence, and other evidence

5

of the purchase, possession or ownership of such weapons, ammunition, and associated items;

e. Records and information related to ordering, purchasing, storage, transportation and sale of controlled substances or firearms, including U.S. currency used in the purchase and sale of controlled substances or firearms, bank and financial records, buyer lists, seller lists, and records of sales, customers, and suppliers;

f. Communications relating to the SUBJECT OFFENSES, including any communications among any accomplices, crew, co-conspirators, or aiders and abettors, whether known or unknown, who helped facilitate or participated in the SUBJECT OFFENSES.

g. Records or information relating to the identity or location of any accomplices, crew, co-conspirators, or aiders and abettors, whether known or unknown, in the commission of the SUBJECT OFFENSES under investigation, including the identity of persons who collaborated, conspired, or assisted (knowingly or unknowingly) in the unlawful distribution or possession with intent to distribute controlled substances or unlawful possession of firearms with the named individuals;

h. Evidence of who used or controlled the TARGET ACCOUNTS;

i. Evidence of the times the TARGET ACCOUNTS were used;

j. Passwords, encryption keys, and other access devices that may be necessary to access the TARGET ACCOUNTS;

k. Information that constitutes evidence indicating the TARGET ACCOUNTS users' state of mind, e.g., intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

l. Information that constitutes evidence concerning how and when the TARGET

ACCOUNTS were accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the TARGET ACCOUNT user;

m. Records of or information about Internet Protocol addresses used by the TARGET ACCOUNTS; and

n. Evidence concerning efforts to conceal evidence of the criminal activity under investigation, or to flee prosecution for the same, including records indicating that data has been deleted by the account users.

### III.    Government procedures for warrant execution

This warrant authorizes a review of electronically stored information, communications, other records, and information disclosed pursuant to this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the ATF may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

The United States government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States. Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.   I am employed by Meta Platforms, Inc. ("Meta"), and my title is _____.   I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.   I state that the records attached hereto are true duplicates of the original records in the custody of Meta.   The attached records consist of _____ [**GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)**].   I further state that:

A.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Meta, and they were made by Meta as a regular practice; and

B.      such records were generated by Meta's electronic process or system that produces an accurate result, to wit:

1.   the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Meta in a manner to ensure that they are true duplicates of the original records; and

2.   the process or system is regularly verified by Meta, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____        _____
Date                                                                    Signature

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

<table>
<tr>
<td>

**IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH TWO INSTAGRAM ACCOUNTS THAT ARE STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC. PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATIONS OF VIOLATIONS OF 21 U.S.C. § 841, 18 U.S.C. §§ 922(g)(1), 922(o), and 924(c)**

</td>
<td>

**SC No. 23-656**

**FILED UNDER SEAL**

</td>
</tr>
</table>

*Reference: USAO Ref. # 2022R1449;Subject Accounts: "no3ree" and "nw3ree"*

<u>**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41
FOR A WARRANT TO SEARCH AND SEIZE**</u>

I, Rebekah Moss, being first duly sworn, hereby depose and state as follows:

<u>**INTRODUCTION AND AGENT BACKGROUND**</u>

1.     I make this affidavit in support of an application for a search warrant for information which is associated with two accounts – that is, "no3ree" (User ID 1214590410) (TARGET ACCOUNT-1) and "nw3ree" (User ID 54544360046) (TARGET ACCOUNT-2), (collectively, the "TARGET ACCOUNTS") – which are stored at premises controlled by Meta Platforms, Inc. ("PROVIDER"), an electronic communications services provider and/or remote computing services provider which is headquartered at 1601 Willow Road, Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B,

10

government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.      I have been a special agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) since May 2014, and a sworn law enforcement officer for over sixteen years. I am currently assigned to the ATF Washington Field Division, National Integrated Ballistic Information Network (NIBIN) Investigation Unit (NIU), which is tasked with investigating gun related crime.

3.      I have successfully completed numerous training programs hosted by ATF, the Federal Law Enforcement Training Center, and other federal law enforcement agencies and organizations. I have received specialized training in the investigation of federal crimes involving the trafficking of firearms and controlled substances. Further, I have participated in numerous drug and firearm trafficking investigations that resulted in the arrest and conviction of numerous subjects, the seizure of property and assets, and the seizure of controlled substances and firearms.

4.      This affidavit is based on my knowledge as well as information provided to me by officers from the Metropolitan Police Department (MPD) for the District of Columbia.  Because this affidavit is being submitted for the limited purpose of a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts which I believe are necessary to establish probable cause for the issuance of a search warrant. All observations referenced in this affidavit, that your affiant did not personally make, were relayed to your affiant by the person or persons who made such observations or in reports that detailed the events described by that person or persons.

5.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that JACKSON has committed and/or

conspired to commit offenses including Possession with the Intent to Distribute a Controlled Substance, in violation of 21 U.S.C. § 841(a)(1); Possession of a Firearm by a Prohibited Person, in violation of 18 U.S.C. § 922(g)(1); Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c); and Possession of a Machine Gun (Conversion Device), in violation of 18 U.S.C. § 922(o) (collectively the "SUBJECT OFFENSES"), and that the TARGET ACCOUNT contains evidence, fruits, or instrumentalities of the commission of the SUBJECT OFFENSES.  There is also probable cause to search the TARGET ACCOUNT, further described below and in Attachment A, for the things described in Attachment B.

## JURISDICTION

6.     This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC.  *See* 18 U.S.C. § 3237.

## PROBABLE CAUSE

### Background: August 17, 2022 Arrest of JACKSON

7.      On August 17, 2022, at approximately 1505 hours, in front of 910 Spring Road NW, Washington, D.C., MPD Crime Suppression 3 personnel (Officers Clifford, Taher, Curtice and Jegede) were on patrol in the area of 14th Street and Oak Streets NW.  Officers were in full uniform and operating an unmarked police vehicle equipped with emergency lights and sirens.

8.      During the course of the officers' patrol, they observed Noah JACKSON (DOB 11/21/2000, FBI #KCX5WT06R) exiting Columbia Heights Market and Vape, at the intersection

of 14th and Oak Street, NW.  Officers then observed JACKSON enter the passenger side of a burgundy 2018 Infiniti QX30 with Maryland tag number 9ES2711, operated by the driver AYANA[1].  The vehicle then sped off at a high rate of speed.  Officers observed the vehicle fail to come to a complete stop at the stop sign located at the intersection of Holmead Place, NW and Oak Street, NW.  Officers started driving towards the vehicle, and after several block officers again observed the vehicle fail to come to a complete stop at the intersection of Spring Rd., NW, and Holmead Place, NW.

9.      Officers were able to initiate a traffic stop in the 900 block of Spring Road, NW. The vehicle abruptly pulled to the curb and Officers Clifford and Taher observed both JACKSON and AYANA erratically moving around inside the vehicle.  Specifically, Officer Taher observed AYANA shifting his body back and to the right towards the floorboard of the rear passenger side of the vehicle.  Additionally, Officer Clifford observed JACKSON, turning back and to the left towards the same floorboard area of the rear passenger side of the vehicle.  As officers approached the vehicle, JACKSON abruptly opened the passenger door and moved to exit without being instructed to do so.  Believing JACKSON was attempting to flee the traffic stop, Officer Clifford ordered JACKSON to stay in the vehicle and positioned himself in a way to prevent JACKSON from fleeing.

10.      Simultaneous to Officer Clifford's actions, Officer Taher approached the driver of the vehicle and made contact with AYANA.  Based on prior knowledge of JACKSON's arrest history,[2] AYANA's and JACKSON's erratic movements that reasonably appeared to be an attempt

---

[1] A subsequent query of Maryland registration 9ES2711 in a law enforcement database by your Affiant indicated that the vehicle at the time of the traffic stop was valid and co-registered to AYANA.

[2] JACKSON is known to the MPD personnel due to his significant online presence as a musician/rapper along with his multiple firearm-related arrests, predominantly in Northwest D.C., which is the location of the traffic stop.

to conceal an object, and JACKSON's attempt to flee from the stop, officers conducted a pat down of AYANA's and JACKSON's persons, as well as a limited protective sweep of the passenger compartment where they observed AYANA and JACKSON reach.

11.    Officer Jegede located a black Glock 23 .40-caliber pistol bearing serial number BTSK493, on the floorboard partially under the front passenger seat, where JACKSON was sitting. Officer Taher subsequently recovered the firearm from the vehicle:



12.    The firearm was loaded with one (1) round in the chamber and 19 rounds in a 22-round capacity extended magazine.  The firearm appeared to be fully functional and designed to expel a projectile by the action of an explosion, had a barrel length of less than 12 inches, and was designed to be fired by the use of a single hand.  The firearm was further equipped with an auto sear, commonly referred to as a "giggle switch," which is designed to render the firearm fully automatic.  AYANA and JACKSON were subsequently placed under arrest for Carrying a Pistol

Without a License, documented under MPD CCN #22-118-311.  AYANA was also cited for multiple driving-related infractions.

13.    AYANA also had an outstanding Grand Larceny warrant in Virginia and was a convicted felon in reference to a Burglary Second Degree in D.C. Superior Court case number 2014 CF2 021964.   For the 2014 burglary case, AYANA was sentenced to 24 months imprisonment followed by 36 months supervised release.

14.    A law enforcement query confirmed that neither AYANA nor JACKSON were licensed to carry a firearm in the District of Columbia.

15.    On February 6, 2018, JACKSON pled guilty to Attempted Robbery, Carrying a Pistol without a License, and Assault with Significant Bodily Injury.    JACKSON was initially sentenced to 18 months of incarceration execution of sentence suspended as to all, followed by two years of supervised probation in D.C. Superior Court case number 2017 CF3 021278. As noted in the plea paperwork signed by JACKSON in that case, the maximum penalty for Attempted Robbery and Assault with Significant Bodily Injury is 3 years in jail and the maximum penalty for Carrying a Pistol Without a License is 5 years in jail.  As a result, JACKSON was aware that he was previously convicted of a crime punishable by more than one year.

16.    At the time of JACKSON's arrest, on August 17, 2022, a buccal swab was not collected by law enforcement.  On September 8, 2022, law enforcement swore out 22-SW-291, a buccal swab warrant on JACKSON before U.S. Magistrate Judge Faruqui of the District Court of the District of Columbia.  On September 9, 2022, your Affiant assisted with the execution of the buccal swab warrant on JACKSON.

17.    At the time of AYANA's arrest on August 17, 2022, a buccal swab was not collected by law enforcement.  On October 13, 2022, law enforcement swore out 22-SW-325, a

buccal swab warrant on AYANA before U.S. Magistrate Judge Harvey of the District Court of the District of Columbia.  On October 13, 2022, law enforcement executed the buccal swab warrant on AYANA.

18.     On October 17, 2022, law enforcement delivered the Glock 23 with "giggle switch" that was recovered on August 17, 2022, to the ATF Firearms Technology Branch to conduct a machine gun determination.  The Glock 23 was reviewed, and a verbal determination was given. It was determined that the firearm submitted was one Glock type firearm with a Glock machinegun conversion device attached.  The Glock type firearm is a "firearm" as defined.  Further, because the device is designed and intended to convert a semiautomatic firearm into a "machinegun," the firearm is a "machinegun" as defined.

19.     On October 18, 2022, law enforcement submitted DNA swabs of the firearm and magazine that had been recovered on August 17, 2022, along with JACKSON's and AYANA's known buccal samples for analysis.  The results from the FBI Laboratory reported male DNA was obtained from the swabs of the firearm. The swabs from the firearm was interpreted as originating from four individuals.  The DNA results from the swabs from the firearm are approximately 620 Septillion times more likely if JACKSON and three unknown, unrelated people are contributors than if four unknown, unrelated people are contributors.  This analysis provides very strong support for the proposition that JACKSON is a contributor to the DNA profile.

20.     The DNA results from the swabs of the firearm are equally likely if AYANA and three unknown unrelated people are contributors than if four unknown, unrelated people are contributors.

21.     The DNA profile obtained from the swabs of the magazine were analyzed and results revealed male DNA was obtained from this item.  The DNA from the swabs were

interpreted as originating from three individuals. The DNA results from the swab of the magazine are 26 billion times more likely if JACKSON and two unknown, unrelated people are contributors than if three unknown, unrelated people are contributors.  This analysis provides very strong for the proposition that JACKSON is a contributor to the DNA profile.

22.     AYANA was excluded as a potential contributor to the magazine.

### January 25, 2023 Arrest of JACKSON

23.     On January 17, 2023, Judge Steven Berk of the Superior Court of the District of Columbia issued a court order (Warrant #: 2023CWSLD000173) authorizing the search of 1416 Quincy Street, Apartment # B1, Northwest, Washington, D.C.

24.     As summarized in the affidavit in support of that search warrant, law enforcement observed heavy foot traffic to and from the location indicative of drug dealing – with multiple individuals briefly entering the apartment and repeatedly leaving with what appeared to be items consistent with narcotics.  For example, on January 1, 2023, one such subject approached the apartment at 8:11 a.m., knocked and entered, and then exited two minutes later with white rock-like items in his hand.  Similarly, on January 6, 2023, a subject entered the apartment at 3:10 p.m., exited one minute later, and then packed an item and began smoking it – consistent with consuming narcotics.

25.     On January 25, 2023, at approximately 1452 hours, Officers with the Metropolitan Police Department's Fourth District Crime Suppression Team executed the search warrant. Upon entry, law enforcement located multiple individuals inside the apartment, to include JACKSON, Malik NORMAN, Andrew HERNANDEZ, Ajani BELNAVIS, Anthony BARNES, Kenneth WOMACK, Nancy BYRD, and Nicquan SEEGERS.

26.     The apartment was found to be a studio unit with one main living space and with

one small bathroom. Officers located BYRD, NORMAN, HERNANDEZ, BELNAVIS, SEEGERS, BARNES, and WOMACK in the main living space. JACKSON was located in the bathroom of the apartment adjacent to the main living space with the door open. After all occupants were secured, a search of the apartment commenced.

27.     In the main living space, law enforcement located: clear twist containing approximately 7 grams of white rock substance; three glass jars containing marijuana; three digital scales (photographed only); Springfield Hellcat 9mm handgun bearing serial # BA359321 and containing nine (9) rounds in the magazine with one (1) round in the chamber ((hereinafter, FIREARM 1); a Polymer 80 Privately Manufactured Firearm bearing no serial number and containing seven (7) rounds of 9mm caliber ammunition in the magazine with one (1) round in the chamber and equipped with a high capacity ammunition feeding device (hereinafter, FIREARM 2); a Glock 23 .40 caliber firearm bearing serial # BEDA982 and containing nine (9) round in the magazine and equipped with a high capacity ammunition feeding device (hereinafter, FIREARM 3); a Glock 31 .357 caliber firearm bearing serial # WZZ623 containing eleven (11) round of ammunition in the magazine and one (1) in the chamber and equipped with a high capacity ammunition feeding device (hereinafter, FIREARM 4); and a grey colored backpack that contained a Taurus 38 Special Revolver bearing serial # ABC429349 containing five (5) rounds in the cylinder (hereinafter, FIREARM 5).  The gray backpack further contained two (2) clear plastic twists which contained approximately 9.2 ounces of marijuana and a cell phone.

28.     It is important to note that during a review of video camera footage from inside the hallways of the apartment building, officers found that BELNAVIS was observed earlier in the day entering the apartment with what appeared to be the same the grey colored backpack that

Firearm 5 was located in.

29.     Upon entry, law enforcement observed JACKSON in the bathroom.  Within the bathroom, law enforcement located one (1) clear twist containing approximately 6 grams of a white powdery substance.

30.     The firearms were seized and processed by the Department of Forensic Sciences. All firearms recovered appeared fully functional, with a barrel length of fewer than twelve inches, designed to be fired with a single hand and capable of expelling a projectile by the means of an explosion.

31.     It was learned that Firearm 1 was reported stolen out of Washington D.C. on October 6, 2022.  Firearm 3 had been reported stolen out of Henrico County, Virginia on March 26, 2019.  Firearm 5 was reported stolen out of Washington D.C. on September 26, 2022.  Firearm 2 and Firearm 4 were not actively registered. Additionally, a NIBIN lead was generated, linking Firearm 1 to a 9mm casing recovered from the ground of a shooting crime scene which occurred at 1405 Spring Road Northwest, on January 2, 2023.  Upon test-firing Firearm 1, cartridge casing evidence was entered into the Integrated Ballistic Identification System and correlated against the database to reveal consistencies with the casing entered into the system from the January 2, 2023, crime scene. It is important to note that 1405 Spring Road Northwest is in close proximity to 1416 Quincy Street Northwest.

*32.*     A search of the metropolitan police department records relating to the issuance of licenses to carry pistols was conducted and revealed none of the individuals inside the apartment had a license to carry a pistol in the District of Columbia.

33.     All occupants of the apartment were placed under arrest and subsequently searched incident to arrest. JACKSON was found to be in possession of a phone.  BARNES was found to

be in possession of a clear plastic twist containing 2.2 grams of a white rock substance in his right pants pocket. A phone was located on the bed and claimed by BARNES. BELNAVIS was found to be in possession of a phone, a clear plastic twist containing approximately .5 grams of white powdery substance, and one digital scale covered in white residue. A phone was located in the gray colored bag that FIREARM 5 was located. SEEGERS was found to be in possession of a clear twist containing approximately 1.9 grams of a white rock substance and one digital scale covered in white residue. NORMAN was found be in possession of a phone, two digital scales covered in white residue, and marijuana concealed in his rear pant area. HERNANDEZ was found to be in possession of a phone.  All of the defendants consented to a buccal swab, and samples were obtained at the 4th District Station.

34.     Law enforcement field tested a small portion of the white powder and rock substances, which yielded a positive chemical color reaction for cocaine base.  Additionally, a small portion of the marijuana was tested which yielded a positive chemical color reaction for THC. A total quantity of approximately 15.9 ounces of suspected marijuana and approximately 15 grams of suspected crack cocaine were seized from the apartment and persons.

35.     On February 21, 2023, a grand jury returned an Indictment against JACKSON in the United States District Court for the District of Columbia (1:23-cr-00053) that charged him with: unlawful possession of a machine gun in violation of 18 U.S.C. § 922(o) and unlawful possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding one year in violation of 18 U.S.C. § 922(g)(1).

36.     On February 21, 2023, an arrest warrant for JACKSON was signed by United States Magistrate Judge Moxila A. Upadhyaya for the United States District Court for the District of Columbia.

37.    On March 2, 2023, at approximately 1652 hours, MPD officers from the 4th District Crime Suppression Team (CST) observed JACKSON, known to officers to have an active District Court arrest warrant, in front of 1416 Quincy Street NW.  JACKSON, noticing the officers enter the block, entered 1416 Quincy Street NW, and ran into apartment B1. Officers entered the location and walked to the door of apartment B1. Prior to officers knocking or taking any action, an individual from inside apartment B1 opened the door and attempted to leave. Officers were in the doorway and could see JACKSON inside the apartment. As individuals began exiting, JACKSON exited the apartment and was stopped in the hallway by officers. The warrant (District Court Warrant number 23CR00053) was confirmed, and JACKSON was placed under arrest. JACKSON was identified via prior police knowledge and confirmed through police databases. JACKSON was transported to the 4th District for processing without incident.

### *Target Account-1*

38.    In August 2022, an MPD Intel Officer advised your Affiant of no3ree, TARGET ACCOUNT-1.  TARGET ACCOUNT-1 was known by other law enforcement to have been used by JACKSON.  Your Affiant is familiar with JACKSON and has included a recent booking photo of JACKSON for comparison.



Noah JACKSON 3/2/2023 - DC Police Department

21

39.     Your Affiant viewed the public account and observed the following:

On May 5, 2022, TARGET ACCOUNT-1 posted a clip from a music video called, "Sloppy Opps,"

which features JACKSON (see below for screenshot of JACKSON in music video clip from Target

Account-1).  The full music video is posted on YouTube, no3ree-Sloppy Opps.  There, lyrics that

JACKSON raps include, "only thing imma click is the switch on the back."   In your Affiant's

experience and training, a switch converts a semi-automatic firearm into a fully automatic firearm

that can fire multiple rounds when the firearm trigger is pulled.  The video also features what

appear to be firearms.



40.     On June 13, 2022, TARGET ACCOUNT-1 posted a clip from a music video called, "E.O.S" (Every Opp Shot), which features JACKSON (see below for a screenshot from the music video).  The full music video is posted on YouTube.  There, lyrics that JACKSON raps include, "Got that switch on his ass he was running … Now we droppin shots on 5th."



### *Target Account-2*

41.     On March 1, 2023, another ATF agent advised your Affiant of nw3ree, TARGET ACCOUNT-2.  Your Affiant viewed the public account and observed the most recent post to be on February 24, 2023, in which TARGET ACCOUNT-2 posted a clip from a music video called, "Drag My Nuts," which features JACKSON (see below for screenshots from the music video). The full music video is posted on YouTube.  There, lyrics that JACKSON raps include, "When that switch going off . . ."  The video features what appear to be firearms throughout the video as well as what appears to be a firearm on a table next to a green leafy substance.





42.     The account also features a post below, which in addition to including photos of JACKSON also indicates that the birthday of the account owner of TARGET ACCOUNT-2 ("@nw3ree) is November 21, 2022, which is also JACKSON's birthday.



43.     Your affiant is aware that it is common for those involved in the sale of narcotics to carry or possesses firearms in furtherance of their narcotics trafficking to protect their product. Your affiant is also aware that when there is a large group of individuals involved in the sale of narcotics, members of the group will commonly trade or share firearms among themselves.  Social media platforms such as Instagram are a common form of communication to facilitate the sale of narcotics, and trading or sale of firearms among conspirators or other individuals involved in such illicit activity – particularly for individuals, like JACKSON, who are prohibited from legally buying firearms.

44.     Your Affiant knows that people who possess firearms like to take pictures of themselves with firearms to prove ownership or possession of a particular firearm to their friends. They will use a camera, cell phone with a camera, tablets with a camera and or personal computers to photograph and store photograph of firearms or themselves holding the firearm and other criminal activity that they may be involved in.  These pictures or videos are excellent evidence of illegal gun possession. Moreover, cell phone apps such as Instagram can be used for

25

communications relating to the acquisition of firearms by those who cannot possess firearms legally, including the transmission of photographs of firearms available for purchase, with accompanying price information.  Indeed, JACKSON appears to have recorded himself with firearms and posted them on Instagram, supporting the conclusion that similar evidence would be found among the data associated with the account that has been retained and stored by PROVIDER.

45.     Based on my training and experience and the foregoing facts, your affiant submits that there is probable cause to believe that JACKSON has violated the SUBJECT OFFENSES and that the TARGET ACCOUNTS contain evidence, fruits, and instrumentalities of the SUBJECT OFFENSES.  The evidence may be relevant to proving the acts and elements of the SUBJECT OFFENSES, including their engagement in, and intent to engage in, the distribution of controlled substances, as indicated by the controlled substances recovered in connection with JACKSON's arrest from the recent search warrant on January 25, 2023.

46.     There is also probable cause based on the above Instagram posts and the recent recoveries of firearms from JACKSON's arrest on August 17, 2022, and JACKSON's arrest on January 25, 2023, to believe the TARGET ACCOUNTS contain evidence of JACKSON's unlawful possession of one or more firearms, including firearms with conversion devices (machine gun), in potential connection with narcotics-related activities.  The TARGET ACCOUNTS may also include evidence concerning where, how, and from whom JACKSON obtained such firearms and conversion devices.  Your affiant is aware JACKSON is a convicted felon and therefore prohibited from being in possession of firearms.

## BACKGROUND CONCERNING INSTAGRAM[3]

47.     Instagram is a service owned by Meta, a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510. Specifically, Instagram is a free-access social networking service, accessible through its website and its mobile application, that allows subscribers to acquire and use Instagram accounts, like the target account(s) listed in Attachment A, through which users can share messages, multimedia, and other information with other Instagram users and the general public.

48.     Meta collects basic contact and personal identifying information from users during the Instagram registration process.  This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, credit card or bank account number, and other personal identifiers.  Meta keeps records of changes made to this information.

49.     Meta also collects and retains information about how each user accesses and uses Instagram.  This includes information about the Internet Protocol ("IP") addresses used to create and use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations.

50.     Each Instagram account is identified by a unique username chosen by the user. Users can change their usernames whenever they choose but no two users can have the same usernames at the same time.  Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

---

[3] The information in this section is based on information published by Meta on its Instagram website, including, but not limited to, the following webpages: "Privacy Policy," https://privacycenter.instagram.com/policy/;     "Information    for    Law    Enforcement," https://help.instagram.com/494561080557017; and "Help Center," https://help.instagram.com.

51.     Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account.  Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality.  For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account, or transfer an image from Instagram to a connected image printing service.  Meta maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Meta and third-party websites and mobile apps.

52.     Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers).  Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments.  Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

53.     Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Meta to access the contact lists on their devices to identify which contacts are Instagram users.  Meta retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture changes and additions.  Users can similarly allow Meta to search an associated Facebook account for friends who are also Instagram users.  Users can also manually search for friends or associates.

54.     Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on

privacy settings.  Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

55.     One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos.  Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location.  These appear as posts on the user's profile.  Users can remove posts from their profiles by deleting or archiving them.  Archived posts can be reposted because, unlike deleted posts, they remain on Meta's servers.

56.     Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram.  Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@").  An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

57.     An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours.  Stories are automatically saved to the creator's "Stories Archive" and remain on Meta's servers unless manually deleted.  The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

58.     Instagram allows users to broadcast live video from their profiles.  Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

59.     Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups.  These messages may include text, photos, videos, posts, videos, profiles, and other information.  Participants to a group conversation can name the group and send invitations to others to join.  Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings.  Senders can't view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot.  Instagram Direct also enables users to video chat with each other directly or in groups.

60.     Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps.  Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

61.     Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag.  Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram.  Meta retains records of a user's search history and followed hashtags.

62.     Meta collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Meta to personalize and target advertisements.

63.     Meta uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content.  Meta maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers.  This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

64.     In some cases, Instagram users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

65.     For each Instagram user, Meta collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

66.     In my training and experience, evidence of who was using Instagram and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

67.     The stored communications and files connected to an Instagram account may provide direct evidence of the offenses under investigation.  Based on my training and experience, instant messages, voice messages, photos, videos, and documents are often created and used in

furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

68.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Meta can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, messaging logs, photos, and videos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the account at a relevant time.  As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account.  Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

69.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.*, information indicating a plan to commit a crime), or consciousness of guilt (*e.g.*, deleting account information in an effort to conceal evidence from law enforcement).

70.     Other information connected to the use of Instagram may lead to the discovery of additional evidence.  For example, associated and linked accounts, stored communications, photos, and videos may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators.  In addition, stored communications, contact lists,

photos, and videos can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

71.     Therefore, Meta's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Instagram.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

72.     Based upon the information described above, your affiant believes that there is sufficient probable cause to believe that there may be evidence, fruits, and instrumentalities of violations, or attempted violations of the SUBJECT OFFENSES contained within the TARGET ACCOUNTS described in Attachment A.

## CONCLUSION

73.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

Rebekah Moss

Special Agent Rebekah Moss
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) by telephone on March 15, 2023.

HONORABLE ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE

33